No. 32,496

THE STATE OF KANSAS, *Appellee*, v. GEORGE SIEG, *Appellant.*

(61 P. 2d 871)

Opinion filed November 7, 1936.

*James B. Kelsey,* of Leavenworth, for the appellant.

*Clarence V. Beck,* attorney general, *Theo. F. Varner,* assistant attorney general, *William D. Reilly,* county attorney, and *James N. Snyder,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This is an appeal from conviction of murder in the first degree.

Appellant shot and killed his stepson, Franklin "Toots" Godfrey, with a 12-gauge automatic sawed-off shotgun. On the same occasion he also shot the wife of deceased, his wife's daughter-in-law. The second shooting was not fatal. About these facts there is no controversy.

Appellant contends the verdict is contrary to the evidence in that the evidence failed to show a willful, deliberate and premeditated killing. This contention requires a consideration of only such evidence as may throw light on the element of willfulness, deliberation and premeditation. The killing took place in the back yard of defendant's residence in Leavenworth. Appellant's home was on

the northwest corner of a street intersection, and faced east. Appellant occupied an addition on the north of the main building. Deceased and his wife had rented the south lower floor from appellant and wife. The front of the south portion was used by deceased as a beer parlor and the rear end for living quarters. Sometime between one o'clock and three on the morning of December 9, 1934, a patron of the beer parlor became noisy and boisterous and it seems he was finally ejected. Some turmoil and disturbance followed in the street. Appellant and his wife were disturbed by the commotion and noise and Mrs. Sieg, appellant's wife, protested to deceased concerning it. A number of people involved in the commotion came into appellant's portion of the building. The scene was anything but orderly. "Toots" Godfrey disarmed appellant of a shotgun, threw it onto the bed, and after a short time the unwelcome guests all left appellant's home. Mrs. Sieg said they were all drunk. Appellant later had a three days' notice served on "Toots" Godfrey and wife to vacate. The rent was not in arrears and the effort to remove them failed. The chief of police was induced to raid the beer parlor, but no liquor was found. Appellant was in default on his contract with the building and loan association and in danger of losing the property. It appeared he was of the opinion "Toots" Godfrey had designs on the property. Clearly the feeling was far from harmonious or friendly. The water, gas and electricity were cut off on the portion of the building occupied by "Toots" Godfrey. The service was replaced and the Godfreys continued to live there.

The eventful episode occurred on January 3, 1935. A barn located on the west end of the yard had been transformed into a garage. The east side of the garage was about 25 paces west of the back door of the north addition and about 19 paces from the back door of the main building. Three stalls opened on the east of the garage, and one opened on the south. The Godfreys had the use of the middle garage, which opened to the east. In it they had stored some cordwood. Mrs. Godfrey noticed Mrs. Sieg throwing some of the wood out of the Godfrey garage. Godfrey was notified and went to the garage. From that point the evidence is much in conflict. Mrs. Sieg testified:

"I just picked up a long stick to lift it off the smaller pile. 'Toots' throws a fist at me, and I raised up and he just hit me here (indicating) as hard as he could. And he throwed me over on kind of a rock place where we drive in to

turn with the car, and I lit on my head, and I didn't get up right away for a minute, so he came right up and kicked me here (indicating)—kicked me right in the back like."

## Mrs. Godfrey testified:

"She just begun throwing the wood and he just jerked back her arm and pulled her out of the garage. She jerked and pulled herself loose from him and she kind of fell on her hand and got up and come towards the house calling George to bring her gun and I stepped outside the door and took hold of her hand and said to her, 'You don't realize what you are doing or you would not do a thing like that to 'Toots.' She says, 'Oh, yes, I will.' I said, 'Oh, no, you wont.' About that time I heard the report of the gun; at that time we were just northwest of our kitchen door, were to the north; I looked toward the barn and saw Mr. Godfrey clutch at his breast and stagger toward the southeast; he was six or seven feet probably from the garage door; when I saw Mr. Godfrey I shoved Mrs. Sieg from me; I run looking back of me. George Sieg was standing in his door with the gun kind of down lowered to his side at that time; he advanced on me; there is a little tree stands in the yard and I walked over to that and kind of clutched that—this tree—with my hands; I didn't know what he might do; he raised the gun and fired, struck my body and shot my arm and you see that; my thumb off and shot the back part of my limb here. Well, thinking he was done I grabbed my arm. Then I says to him, I says, 'George, why did you shoot me?' He says, 'I told you to move.' Mrs. Sieg says, 'I knew that was going to happen; I knew that was going to happen.' Then he raised the gun again and aimed it at me. I says, 'Oh, George, don't shoot; let me live long enough to do something for Toots.' He says, 'I am going to kill both of you,' and turned. She took hold of his arm. She says, 'Shoot her.' She still was mad. I said, 'Shoot, you cowards,' and walked away, and he telling all the time he was going to shoot me again."

There was evidence the shell had jammed, preventing the third shot. On the subject of deliberation and premeditation there was other evidence than the above statement of Mrs. Sieg, to wit: "I knew that was going to happen—I knew that was going to happen." Mrs. Harry Waisner testified:

"On December 31, Mr. Sieg told me if they didn't move you can take him to Davis' (J. C. Davis Undertaking Co.), and I am going to the penitentiary. He says in the morning I am shutting off the gas, lights and water; if he had that gun two weeks ago when the rumpus come up he would have killed everyone of them, but the gun was not loaded."

## Mr. Max Schafer testified:

"My wife and Mrs. Godfrey are sisters; about two weeks before the shooting Sieg showed me a 12-gauge shotgun shell and says, 'If they come in house I am going to use that; *I got it a purpose for this.*' "

Mrs. Orville Tuttle testified:

"Two weeks before the shooting I was in there around noontime. Mr. Sieg said he was going to kill him. He didn't say who; there was no talk or trouble about renting the place prior to that that I heard; it was on Tuesday before the shooting that I heard George Sieg say that."

The foregoing evidence amply supplied the element of premeditation and deliberation. There was evidence appellant had been threatened by Godfrey and his wife, and that they were afraid to go out into the yard. No doubt life had become exceedingly unpleasant with the surroundings at appellant's home. He was undoubtedly annoyed and harassed. There was probably much cause for bitterness on his part. These facts, however, do not erase the evidence of premeditation and deliberation. On the contrary, they tend to supply the basis for exactly such deliberation and premeditation.

Appellant further contends the testimony of "Toots" Godfrey's wife concerning the shooting of her was incompetent and prejudicial. It is argued appellant was not on trial for the shooting of Godfrey's wife. This evidence was admitted only for the purpose of showing what occurred at the very time and place of the shooting of "Toots" Godfrey. The court definitely so instructed the jury. Furthermore this evidence revealed the fact that appellant stated, *"I am going to kill both of you."* That statement applied to deceased as well as to his wife and could not be separated. The evidence was clearly a part of the *res gestae* and under the circumstances was properly received.

Appellant further contends certain instructions were misleading. The point is not well taken. Other complaints have been noted. They in no way prejudiced the substantial rights of appellant. He had a fair trial and the judgment must therefore be affirmed. It is so ordered.